---

(No. 14049.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MIKE STANKEVIC, Plaintiff in Error.

*Opinion filed October 22, 1921.*

1. CRIMINAL LAW—*when instruction as to reasonable doubt is not misleading.* Where the jury are fully instructed as to the presumption of the defendant's innocence, the fact that an instruction defining reasonable doubt speaks of it as a doubt which the jury are "permitted" to entertain does not tend to mislead the jury into believing that an acquittal is not obligatory if they have a reasonable doubt, particularly where the sole purpose of the instruction is to define the term reasonable doubt and to show that it must be as to the whole case and not as to any particular fact.

2. SAME—*when instructions are properly refused.* Instructions are properly refused where they are limited to particular facts and circumstances and not to the whole evidence or where they are fully covered by other instructions given.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ALBERT C. BARNES, Judge, presiding.

T. FRED LARAMIE, for plaintiff in error.

299—16

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, ALBERT D. RODENBERG, WILLIAM LISTER, and EDWARD E. WILSON, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Plaintiff in error, Mike Stankevic, was convicted in the criminal court of Cook county of rape upon the person of Annie Yuketis, a child eleven years old, and was sentenced for a term of five years in the penitentiary. He has brought the record to this court as a return to a writ of error.

The court is asked to set aside the judgment of the criminal court on the ground that the verdict is not supported by the evidence, and the arguments on both sides are devoted mainly to that question.

It was charged that the crime was committed on March 1, 1919. The defendant was forty-seven years of age, married and living with his family, consisting of his wife, four children to whom he was both uncle and step-father, and two children of his own. Annie Yuketis was eleven years of age and lived with her parents and family. The families had formerly lived in different flats or apartments in the same building but the defendant had moved to another place near by. They were all Lithuanians, and Annie was accustomed to play with the defendant's step-daughter Mary, a child nine years of age. Annie testified that on March 1, 1919, she went between one and two o'clock in the afternoon to defendant's home for Mary to go to the movies; that the defendant told her and Mary to come into the shanty out in the alley and he would give them a nickel to go to the show; that they went back of the house to the shanty and he pulled her into the shanty and Mary ran into the alley; that the crime was committed and she started to holler, and he told her if she hollered he would kill her;

that there was an issue of blood, and he wiped it up with
rags and told her to go home and stay by the fire and it
would stop, and not to tell her mother or he would kill
her; that he was going to give two dollars to his daughter
to bring to her; that when she left the shanty she met Mary
and went with her over to the show place, but when they
got there they found there was no show that afternoon;
that it was afterward agreed that she should tell her mother
that she had fallen on the ice, and that she did so at first
but informed her mother of the truth afterwards. Antonia
Yuketis, an older sister of Annie, testified that Annie left
home about one or two o'clock and witness searched for her
and found her with Mary Stankevic; that when she met
Annie both her hands were bloody and blood was flowing;
that they went to defendant's home and there made up to
tell that Annie fell on the ice, and the defendant said that
would be all right; that the defendant was in the shanty
chopping wood at that time, and that she and Annie went
home and they used peroxide and made efforts to stop the
blood.

There was no dispute or controversy in the evidence
as to the physical condition of Annie after her sister met
her. Annie's mother was told that she had fallen on the
ice and she was placed in bed and a doctor was called, who
found an internal issue of blood and found some bruises
but made no particular examination. He prescribed ice and
internal medicine, and testified that the blood was flowing
profusely and he could only make a superficial examina-
tion. There was evidence that he made none except to take
up the bedclothes and look at the condition. Annie told that
doctor that she had fallen on the ice but afterward made
the same statement to her mother to which she testified on
the trial, and another doctor was then called. That doctor
found a profuse issue of blood, and testified that he could
only tell that fact by the amount of rags lying around used
to mop up the blood. Afterwards he made a particular

examination and found a rupture of the hymen and the conditions which would result from the commission of a crime as charged, including a primary laceration of the perineum of about one-half an inch, which was necessarily caused by external violence. On the night of the injury Sophia Morsich took care of Annie, stayed with her that night and made every effort to stop the issue, and afterward witnessed the examination by the doctor, when she saw the laceration of the perineum.

The defendant denied that he went to the shanty and called Annie there or committed the act charged, and testified that he went with his step-daughter and niece, Mrs. Anna Rupsh, about two o'clock, to stores on Twelfth street and got home about five o'clock. The step-daughter, Anna Rupsh, gave the same testimony, and said that she was not married at that time; that she worked at Leggett Myer until twelve o'clock and came home; that Annie did not come there at any time before she and the defendant left at two o'clock to go on their shopping tour. Mary Stankevic testified that Annie did not come to their house that day; that she met Annie and they went over to see the show and the man said it was out; that she proposed to go sliding on the ice until it opened, and they went sliding and Annie fell down, and when she got up they went to Annie's home, and that Annie did not come to their house while her father was there. There was a vacant lot across from the show place where there was ice and also across the alley back of the defendant's house. The doctor who was first called said that there were bruises on the person of Annie, and gave an opinion that the condition in which he found her might have been produced by a fall on a large piece of ice with a sharp point and that the act charged would not have produced that condition. The condition observed by that doctor did not include the laceration of the perineum, and, so far as that injury is concerned, persons of ordinary intelligence would be as well able to judge

as the doctor, and could scarcely be expected to believe that a fall, except under the most extraordinary conditions, could have produced such an injury. Several witnesses testified to the previous good character of the defendant, and this testimony, together with that above recited, was all the evidence of importance introduced on the trial.

The evidence as to the physical condition of Annie is convincing, beyond reasonable doubt, that a criminal assault upon her was committed, and the argument that the location of Annie, as described by her, upon a bag containing coal, on the top of a barrel, caused practical difficulties for the commission of the act, is not sufficient to raise such a doubt. The injuries proved lead to the necessary conclusion that the crime was committed and justified the verdict.

It is argued that the court erred in giving the eighth instruction at the instance of the People, as follows:

"The rule requiring the jury to be satisfied of the guilt of the defendant from the evidence, beyond a reasonable doubt, in order to warrant a conviction is complied with, if, taking the testimony altogether the jury are satisfied beyond a reasonable doubt that the defendant is guilty.

"The reasonable doubt the jury is permitted to entertain to authorize an acquittal must be as to the guilt of the accused on the whole evidence, and not as to any particular fact in the case, not material to the issue in the case.

"A doubt produced by undue sensibility in the mind of any juror, in view of the consequences of his verdict, is not a reasonable doubt; the jury are not to go beyond the evidence to hunt up doubts and not allowed to create sources or materials of doubt by resorting to trivial and fanciful suppositions and remote conjecture as to the possible states of fact, different from that established by the evidence. A doubt to justify an acquittal must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case, and unless it is such that were the same kind of a doubt interposed in the graver transactions

of life, it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty. If, after considering all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied, beyond a reasonable doubt."

The objections to the instruction are that the use of the word "permitted" was misleading, because if the jury were not satisfied beyond a reasonable doubt an acquittal was obligatory, and that the last paragraph practically amounted to a warning against entertaining a reasonable doubt. The jury were repeatedly advised by instructions as to the legal presumption of innocence, and that if they had a reasonable doubt of the defendant's guilt after a careful and unbiased consideration of all the evidence in the case they must resolve that doubt in his favor and return a verdict of not guilty. This instruction was the only one given defining reasonable doubt, and its purpose was not only to define the meaning of the term, but to inform the jury that the reasonable doubt must be on the whole case and not as to some particular fact. We do not see how the jury could have been mistaken as to the meaning of the instruction or could have regarded it as a warning against entertaining a reasonable doubt.

In the brief of points and authorities it is said that the court erred in refusing to give instructions 1, 3, 4, 5, 6, 7, 8 and 9 requested by the defendant, but they are not mentioned in the argument and will not be discussed in detail. Some of them were properly refused because they were limited to particular facts and circumstances and not to the whole evidence, and others were fully covered by instructions given. They were all properly refused because either covered by other instructions, improper in themselves or not based on any evidence.

The judgment is affirmed.        *Judgment affirmed.*